UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

E.E., on behalf of herself and as next friend
to her child, Y.A., and Y.A.,

                         FIRST AMENDED COMPLAINT

            Plaintiffs,

        - against -                 Civ. No. 23-cv-11310 (SHS)(RLB)

New York City Department of Education, the Board
of Education of the City School District of the City
of New York, Chancellor David Banks, in his official
capacity, and the City of New York,

            Defendants.
_____X

## PRELIMINARY STATEMENT

1.     This is an action brought by E.E. on behalf of herself and her child, Y.A., alleging that Defendants, the New York City Department of Education ("DOE"), the Board of Education of the City School District of the City of New York ("BOE"), Chancellor David Banks, in his official capacity, and the City of New York (collectively "Defendants"), violated Plaintiffs' rights under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., 42 U.S.C. § 1983 ("Section 1983"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), the Americans with Disabilities Act of 1990 ("ADA"), as well as New York State law, which is incorporated by reference into the IDEA. Additionally, Plaintiffs seek attorney's fees and costs under the IDEA.

2.     Y.A. is a named Plaintiff in a class action, *M.G. v. New York City Department of Education*, 13-cv-4639, which is pending in the Southern District of New York.  He is a named Plaintiff of both certified and putative classes and subclasses in that action, as he attended a state-approved non-public school, and received an extended-day program of Applied Behavior Analysis

1

("ABA") and related services.   Further, he is currently entitled to stay-put placement under the IDEA, 20 U.S.C. 1415(j) with respect to his program, including his ABA program, but is not receiving all of his mandatory stay-put services.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action as one raising a federal question under 28 U.S.C. § 1331, under 28 U.S.C. § 1343(a)(4), and under the IDEA, 20 U.S.C. § 1415(i)(3).

4.      The Court has supplemental jurisdiction to adjudicate state claims arising out of the same facts as the asserted federal claims.  28 U.S.C. § 1367.

5.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1), as it is the judicial district in which Defendants are situated and/or reside.

## PARTIES

6.      Plaintiff E.E. is the mother and legal guardian of Y.A., a  young man diagnosed with autism.[1]

7.      At the time of the original complaint, Y.A. was a twenty-one-year-old.

8.       Y.A. turned twenty-two at the end of April 2024, a few weeks away.

9.      E.E. and Y.A. live together in Brooklyn, New York.

10.     Y.A. has been classified by the DOE as a student with a disability entitled to a free appropriate public education ("FAPE") under the IDEA.

11.     Y.A. is also a qualified individual with a disability who is eligible for a FAPE under

---

[1] Plaintiffs are identified by their initials throughout this Complaint to preserve the confidentiality of sensitive medical, educational, and disability-related information under the IDEA, 20 U.S.C. § 1417(c), and the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g(b).  The minor children are identified by their initials based on the above as well as in accordance with Federal Rule of Civil Procedure 5.2(a)(3).

Section 504 and is protected from discrimination based upon his disability.

12.    Defendant BOE was or continues to be the official body charged with responsibility for developing policies with respect to the administration and operation of the public schools in the City of New York pursuant to New York Education Law § 2590-b.

13.    Upon information and belief, Defendant David Banks is the Chancellor of the New York City School District ("Chancellor") and, as such, is entrusted with the specific powers and duties set forth in New York Education Law § 2590-h.

14.    Defendant DOE is a municipal agency and a creation of the BOE pursuant to its bylaws.

15.    Defendant City of New York ("City") is a municipal entity created and authorized under the laws of the State of New York.

16.    Defendants BOE and DOE are agencies of Defendant City, which is ultimately responsible for managing those agencies, funding special education services, and implementing the relief requested pursuant to this action.

17.    The BOE, DOE, and Chancellor (collectively "Educational Defendants") jointly and/or individually constitute the Local Educational Agency ("LEA") under the IDEA and New York State law.

18.    The Educational Defendants are responsible for providing a FAPE to all eligible students in New York City and for promulgating policies and procedures in accordance with the IDEA.

19.    All Defendants jointly and/or individually are recipients of federal financial assistance.

20.    When the "DOE" is referenced throughout, the term DOE refers individually to

3

Defendant DOE, as well as collectively to the Educational Defendants.

## LEGAL FRAMEWORK

### The IDEA

21.     The IDEA is designed to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education, and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A).

22.     States receiving federal financial assistance under the IDEA must adhere to the Act's procedural and substantive requirements and ensure that all eligible students with disabilities are afforded a FAPE.  20 U.S.C. § 1412(a).

23.     To be entitled to a FAPE, a student must have one or more of thirteen disabling conditions and, by reason of the disability, require special education and related services.  34 C.E.E. § 300.8(a)(1); *see also* 8 N.Y.C.R.R. § 200.1(zz).

24.     A FAPE must meet each student's "unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also* 8 N.Y.C.R.R. § 200.1(qq), (ww), (fff).

25.     A FAPE must be provided in conformity with an Individualized Education Program ("IEP").  *See* 20 U.S.C. §§ 1401(9)(D), 1414(d)(2)(A); 8 N.Y.C.R.R. § 200.6(a)(2).

26.     Every student with the designated disability classifications is entitled to an IEP, and the LEA must provide an IEP which is individually tailored to each student, and which sets forth the student's special education program and services. 20 U.S.C. § 1414(d); 8 N.Y.C.R.R. § 200.6(a)(2).

27.     School districts must have an IEP in place for each student with a disability at the beginning of each school year and must review that IEP not less than annually.  20 U.S.C.

§§ 1414(d)(2)(A), (d)(4)(A)(i); *see also* 8 N.Y.C.R.R. § 200.4(f).

28.    The IDEA prescribes, in detail, the process for developing IEPs and their contents. 20 U.S.C. §§ 1414(d)(1), (d)(2); 34 C.E.E. §§ 300.320(a)-(b), 300.324; *see also* N.Y. Educ. L. § 4401, *et seq.*; 8 N.Y.C.R.R. § 200.4(d)(2).

29.    Before an initial IEP can be developed, a student must be evaluated in accordance with detailed procedures outlined in federal and state law.  The IDEA mandates that school districts conduct a full and individualized initial evaluation of each student with a disability and reevaluate the student at least once every three years, unless the parent and the school district agree otherwise. 20 U.S.C. §§ 1414(a)(1)(A), (a)(2)(B)(ii); *see also* 8 N.Y.C.R.R. § 200.4(b)(1)-(6).

30.    Evaluations must be "sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified."  34 C.E.E. § 300.304(c)(6).  School districts must assess students "in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities."  34 C.E.E. § 300.304(c)(4).

31.    The school district must ensure that "assessments and other evaluation materials used to assess" a student "are selected and administered so as not to be discriminatory on a racial or cultural basis" and "are provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is not feasible to so provide or administer." 20 U.S.C. § 1414(b)(3)(A)(i)-(ii); *see also* 8 N.Y.C.R.R. § 200.4(b)(6)(i)(a), (d).

32.    The IDEA permits parents to seek independent educational evaluations ("IEEs") if they disagree with the school district's evaluation.

**Due Process Procedures**

33.     One of the IDEA's most well-known due process rights is the right to request an impartial hearing "with respect to any matter relating to the identification, evaluation, or educational placement of [a] child" or the provision of FAPE to a child.   20 U.S.C. § 1415(b)(6)(A).

34.     Thereafter, a parent "shall have an opportunity for an impartial due process hearing, which shall be conducted by the State Educational Agency ("SEA")] or by the Local Education Agency ("LEA") as determined by State law or by the [SEA]." 20 U.S.C. § 1415(f)(1)(A). In New York, IDEA due process complaints are litigated in a hearing conducted at the initial administrative level before an Impartial Hearing Officer ("IHO").   N.Y. Educ. L. § 4404(1); 8 N.Y.C.R.R. § 200.5(i)-(j).

35.     The IDEA sets forth detailed requirements for hearing procedures.   20 U.S.C. §1415(f); 34 C.E.E. §§ 300.511-516.

36.     The decisions reached in impartial hearings are subject to administrative appeals to the State Review Officer, the second-tier administrative review under the IDEA.   34 C.E.E. § 300.514(b); N.Y. Educ. L. § 4404(2); 8 N.Y.C.R.R. § 200.5(k).

37.     An IHO decision that is not appealed is final and binding. *See* 34 C.E.E. § 300.514(a); 8 N.Y.C.C.R. § 200.5(j)(5)(v).

38.     Parents that prevail in a due process hearing may have the school district, here the Defendants, pay their reasonable attorney's fees.  20 U.S.C. § 1415(i)(3)(B)(i)(I).

**Section 504**

39.     Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance."  29 U.S.C. § 794; *see also* 34 C.F.R. §§ 104.33–104.37.

40.     Y.A. is an "otherwise qualified" disabled individual who was excluded from public education due to their disabilities.

41.     Y.A. has serious health conditions that interfere with major life activities.

42.     "Major life activities" are defined to include, but not be limited to "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working (34 C.F.R. § 104(3)(j)(2)), as well as "eating, sleeping, standing, sitting, reaching, lifting, bending, reading, concentrating, thinking, communicating, and interacting with others" (29 C.F.R. § 1630.2(i)(1)(i)).

43.     Y.A.'s autism and other disabilities individually and collectively substantially limit several major life functions, including learning, speaking, caring for himself, thinking, reading, communicating and interacting with others.

44.     Section 504 also requires the Defendants to evaluate children with disabilities and provide a FAPE to eligible students. 34 C.F.R. § 104.33(b).

45.     Under Section 504, Defendants were required to provide reasonable accommodations to children with disabilities, such as Y.A.

46.     These reasonable accommodations are required to be provided to students with IEPs independent of their IDEA rights.

## FACTS

47.     Y.A. is now over twenty-two years old.

48.     E.E. and Y.A.'s father filed their first impartial hearing on a *pro se* basis in June of 2007, when Y.A. was five.

49.     After that initial complaint was filed, E.E. obtained counsel. The DOE conceded it denied Y.A. a FAPE in the 2007-2008 and 2008-2009 school years.

50.     In a 2008 Decision in this first hearing, an IHO found that the DOE had violated the law in a number of ways with respect to Y.A.

51.      Among other things, this IHO in the 2008 Decision found that the DOE had employed illegal blanket policies that prohibited recommendations of Applied Behavior Analysis ("ABA") and research-based methodologies on the IEPs of children diagnosed with autism.

52.     The IHO in the 2008 Decision also found that the DOE had violated Y.A.'s rights by changing Y.A.'s placement without evaluating him.

53.     The IHO also ruled that the DOE had failed to provide E.E. with adequate Prior Written Notice under the IDEA.

54.     Among other things, the IHO in the 2008 Decision issued an order directing the DOE to provide Y.A. with ABA services for five hours per day, seven days per week, on a 52-week school year, which Y.A. could use for at least two years and could be carried over.  He also ruled that Y.A. should have additional ABA services, including shared time between providers.

55.     The IHO also ruled that Y.A. should receive at least five hours per week of speech and language services.

56.     The IHO expressly ordered that the DOE amend Y.A.'s IEP to include the ordered services and supports, including the ABA.  Yet, the DOE did not follow this aspect of the 2008 Decision to include the extended day program of ABA and speech therapy.

57.     Between the time E.E. filed her first hearing when Y.A. was five years old, E.E. has spent the past seventeen years in litigation, simply to keep Y.A.'s services in place or recoup the services that were legally mandated to be provided but which were not implemented, either through the IDEA's stay-put provisions (20 U.S.C. § 1415(j)) or final orders of hearing officers.

58.     Since the 2018 Decision, and almost annually until Y.A. turned twenty-one, E.E. had to file an impartial hearing to keep Y.A.'s 1:1 instruction, ABA and extended-day, after-school services  ("Autism Services") in place.

59.     Further, while one litigation is pending, the DOE holds an IEP meeting for the following year, requiring the parent to file repeated, similar complaints to keep the services in place.

60.     Year, after year, the DOE would hold an IEP meeting and when E.E. asked about the 1:1 instruction, ABA, and extended day program, the representatives present at the IEP meeting would inform E.E. that they could not consider these services for the IEP and, instead, they advised E.E.  that she would have to file for an impartial hearing if she wanted the services.

61.     The facts alleged in this amended complaint cover the last remaining years of the gauntlet that E.E. has had to complete for Y.A. to finish his educational journey with Defendants.

62.

63.     On August 27, 2018, the IHO in Case No. 161384 issued a Findings of Fact and Decision ("FOFD").

64.    The IHO found that the DOE failed to provide the Student with a FAPE for the 2016-2017 and 2017-2018 school years and that it failed to provide pendency services to the student.

65.    The IHO ordered that the Student is entitled to a bank of ABA and SLT compensatory hours that he should have received but did not receive during the school years at issue.

66.    Further, she found that the program that constituted the pendency placement continues to be an appropriate program for the Student.

67.    Following the issuance of the IHO's decision and the filing of the amended complaint, the DOE failed to take any steps to implement the order and/or incorporate the terms of the student's programs in an IEP.

68.    On August 28, 2018, E.E., through counsel, filed a due process complaint ("2018 DPC"), seeking an impartial due process hearing against Defendants pursuant to the IDEA and Section 504 alleging, *inter alia*, a denial of a Free Appropriate Public Education ("FAPE") under the IDEA for the 2018-2019 school year. E.E. amended her complaint twice after filing it, with the last amendment filed on January 29, 2019.

69.    Defendant DOE assigned the 2018 DPC a case number of 175916. The allegations in the 2018 DPC are incorporated herein by reference.

70.    On November 4, 2018 the IHO in Case No. 175916 issued an Interim Order on Pendency (the "2018 IOP").

71.    The 2018 IOP ordered, *inter alia*, the following:

That the New York City Department of Education is directed to provide and fund the following weekly services as the Student's pendency ("stay put") program during the pendency of this proceeding and any appeals thereof : placement at the Heartshare School with 1:1 speech therapy 2x30 and 1:1 occupational therapy 2x30, minibus special education

10

transportation, five hours per week of after-school 1:1 speech-language therapy at the Student's home, thirty-five hours per week of 1:1 Applied Behavioral Analysis ("ABA") after-school at an enhanced rate, with all services to be provided on a twelve month school basis, except that the ABA services are to be provided on a 52 week school year basis;

72.     Predictably, on May 20, 2019, while Case No. 175916 was still pending, the DOE held an IEP, and a subsequent IEP was issued (the "2019 IEP").

73.     Again, like clockwork, the DOE representative told the parent that the IEP team is only considering keeping the services the same for the Heartshare school and is unable to discuss or consider the after-school ABA and speech services, as those have to be addressed the through the impartial hearing.

74.     As per the DOE's policy and procedure in every IEP meeting, the DOE's representative advised the parent that the IEP team cannot include the after-school hours of speech and ABA and that the parent had to obtain these services through the impartial hearing process.

75.     Specifically, the school psychologist told the parent the following: "we only recommend school-based services we understand that you have been getting those through the Impartial process."

76.     The DOE did not conduct a legally sufficient transition assessment, develop an appropriate transition plan or offer any transition services.

77.     Heartshare was not an appropriate program for Y.A. at this point.  He is not making adequate process there. Heartshare had vacancies, staff turnover, problems with functional grouping and did not offer an appropriate transition services plan and support.

78.     While Case No. 175916 was pending,  E.E filed another due process complaint in June 2019, alleging that the DOE failed to provide an IEP and placement. The DOE designated this complaint as IH Case No. 184047.

79.     The IHO in IH Case No. 184047 issued a pendency order on November 4, 2019, directing the DOE to

[F]und the following weekly services as the Student's pendency ("stay put") program during the pendency of this proceeding and any appeals thereof : placement at the Heartshare School with 1:1 speech therapy 2x30 and 1:1 occupational therapy 2x30, minibus special education transportation, five hours per week of after-school 1:1 speech-language therapy at the Student's home, thirty-five hours per week of 1:1 Applied Behavioral Analysis ("ABA") after-school at an enhanced rate, with all services to be provided on a twelve month school basis, except that the ABA services are to be provided on a 52 week school year basis.

80.     The DOE never provided E.E.  with a copy of the proposed 2019 IEP in resolution.

81.     However, as part of the impartial hearing process in January 2020, the DOE's lawyer first time claimed that it was defending the 2019 IEP.

82.     The DOE provided the 2019 IEP to the E.E.'s counsel on January 7, 2020.  This was the first time the DOE had provided a copy of the IEP to the Parent.

83.     As with the previous years' IEP, the 2019 IEP denied Y.A. a FAPE for all the reasons that E.E. alleged in her due process complaint.

84.     In March 2020, the COVID-19 Pandemic occurred, and all IEP-based instruction was directed to be remote.

85.     On April 29, 2020, the DOE held another IEP meeting (the "April 2020 IEP").

86.     The April 2020 IEP did not include Y.A.'s home speech services, nor ABA, effectively terminating them for the 2020-2021 SY.

87.     As with the previous years' IEP, the 2020 IEP denied Y.A. a FAPE. for all the reasons that E.E. alleged in her due process complaint.

88.     Initially, the DOE had not clarified or confirmed that Autism Services ordered through pendency or impartial hearing decisions could be implemented in person, but after a few

months, the DOE did confirm that Autism Services, along with other services ordered through hearings, could be delivered in person.

89.     During the 2020-2021 school year, therefore, Y.A. did received some of his stay-put ABA and speech therapy on an in-person basis.

90.     Y.A. returned to Heartshare for the 2020-2021 school year.

91.     Y.A. was receiving remote learning after the COVID-19 Shutdown in March 2020.

92.     Upon information and belief, Y.A. received about 2-3 hours of direct remote instruction per day, maximum.

93.     It was difficult for Y.A. to engage in certain remote instruction, given his short attention span and sensitivity to sounds.

94.     Y.A.'s progress stalled initially, but eventually he started to make some progress in certain areas. However, his social skills and echolalia increased.

95.     At the end of the hearing in IH Case No. 175916, the IHO ruled in favor of E.E. and Y.A. and issued a Findings of Fact and Decision on December 29, 2020 (the "2020 Decision"), finding that the DOE denied Y.A. a FAPE for the 2018-2019 school year.  The IHO ordered independent evaluations, including a transition assessment and extended observation at Heartshare, compensatory education relating to the lack of vocational training, as well as limited time travel special education transportation.

96.     On January 8, 2021, after Case No. 175916 was pending but before a decision was issued in Case No. 184047, E.E. filed another due process complaint about the 2020 IEP. The DOE designated this IH Case No. 205876.

13

97.     As of the filing of the DPC in IH Case No. 205876, Y.A. was mandated to receive his stay-put services under the IHO's September 1, 2019 pendency order issued in Case No. 184047, which had not yet resolved.

98.     On May 7, 2021, the DOE held another IEP meeting and once again terminated Y.A.'s extended day program and created an IEP which denied Y.A. a FAPE.

99.     However, at the time, Y.A. was still mandated to receive his pendency services.

100.    On October 11, 2021, the IHO in Case No. 184047 issued a decision finding that the DOE denied Y.A. a FAPE ("2021 Decision). The IHO ordered the DOE to fund a private neuropsychological evaluation. In addition, the IHO ordered the DOE "to prepare an accounting of all pendency services provided to the Student during the period March 1, 2020 through January 8, 2021 within two (2) weeks" of the IHO's decision and order the DOE to provide Y.A. with "a bank of compensatory education services equivalent to the number of pendency-mandated hours of instruction and services missed during the period March 1, 2020 through January 8, 2021." The DOE has not provided this accounting or authorized this bank of services. In addition, the IHO awarded additional compensatory education.

101.    E.E. then filed a new due process complaint on September 8, 2022, which was consolidated with IH Case No. 205876.

102.    At issue IH Case No. 205876 was the issue of a FAPE for three school years, 2020-2021, 2021-2022 and 2022-2023 ("SYs at Issue II"), and the appropriateness of three IEPs: and IEP prepared in 2020, 2021 and 2022.

103.    Pursuant to a Pendency Order dated December 21, 2021 issued by the IHO, Y.A.'s program pursuant to 20 U.S.C. §1415(j) during the pendency in Case No. 205876 included placement at the Heartshare School with 1:1 speech therapy 2x30 and 1:1 occupational therapy

("OT") 2x30, minibus special education transportation, five hours per week of after-school 1:1 speech-language therapy at the Student's home, thirty-five hours per week of 1:1 Applied Behavioral Analysis ("ABA") afterschool, with all services to be provided on a twelve month school year basis, except that the ABA services are to be provided on a 52 week school year basis.

104.    Plaintiff Y.A. was entitled to pendency during the time that Case No. 205876 was pending.

105.    Even though E.E. and Y.A. were at the end of their journey because Y.A. was aging out soon, in Case No. 205876 the DOE assigned a senior litigator who elected to aggressively litigate the case, trying to defend their IEPs and placement from Heartshare. This was the first time since the 2018 Decision that the DOE decided to try to defend a FAPE.

106.    E.E.'s counsel tried, in vain, to convince the DOE's attorney that it did not make sense to litigate this this hearing, and that it was neither in the bests interest of the DOE nor EE to do so, but those efforts to streamline this case were ignored and dismissed.

107.    As a result, the DOE's witnesses testified to multiple admissions which conclusively establish liability under the IDEA, Section 504 and Section 1983, not only for the individual student's case, but for the class and subclasses that he represented through the M.G. Class Action.

108.    E.E. submitted several exhibits marked A through MMM. The DOE submitted twenty-four exhibits.

109.    During the hearing, the DOE representatives at all three IEPs at issue (DOE Ex. 1, 7 and 11 in the administrative record or "AR") testified that the ABA, 1:1 instruction and extended day services could not be considered or placed on an IEP.

110.    The first witness, M.W., was a special education teacher licensed for grades 1-6. She worked for the DOE for 30 years and had been serving as an IEP teacher in DOE's Region 7 since 2019.  M.W. was the District Representative at 2020 and 2021 IEP meetings

111.    Under the IDEA, the role of the "District Representative" is to be knowledgeable about the district's programs and services.

112.    M.W. admitted that under the DOE's policies and practices, she would not have been able to recommend ABA or after school services on Y.A.'s IEP and was constrained to recommend only the services available at Heartshare.

113.    The DOE also called J.S., the District Representative at Y.A.'s 2022 IEP meeting.

114.    J.S. had worked at the Committee on Special Education ("CSE") for more than twenty-years.

115.    J.S. testified that  under the DOE's policies and practices, he could not have recommended after-school services on an IEP and ABA is not on the DOE's continuum of services.

116.    J.S. also explained that the DOE's IEP teams are not permitted to recommend after-school services on an IEP and that "[a]ll the services on an IEP are relegated to in-school services that are -- that would help have an educational benefit."

117.    Beyond the above admissions, through the testimony of the DOE's employees established a range of actions (and inactions) relative both to Y.A. and students with IEPs in general that violated the IDEA, Section 504 and demonstrated violations under Section 1983.

118.    The record at the hearing established that the DOE had not conducted a triennial reevaluation of Y.A. – *i.e.,* the required three-year evaluation under the IDEA – with respect to any of the SYs at Issue II.

119.    The record at the hearing established that the DOE had not been implementing the IDEA relative to its obligation to provide transition assessments and transition services.

120.    In the 2004 IDEA reauthorization Congress expanded the transition services provision of the IDEA, finding that "[a]s the graduation rates for children with disabilities continue to climb, providing effective transition services to promote successful post-school employment or education is an important measure of accountability . . ." 20 U.S.C. § 1400(c)(14)).

121.    The IDEA required every IEP for Y.A. that was going to be in effect when he was 16 years old (or a younger age if appropriate) to include "Transition Services." 8 N.Y.C.R.R. § 200.4(d)(2)(ix)(a); *See* 20 U.S.C. §   1414 (d)(1)(A)(i)(VIII)(aa)-(bb)); *see also* 34 C.F.R. §§ 300.43, 305(e)(3), 300.320(b).

122.    Transition Services are defined as:

A coordinated set of activities for a child with a disability that is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

34  .F.R. § 300.43(a)(1).

123.    Transition Services can include "special education," "related services," "instruction," "community experiences," and "the development of employment and other post-school adult living objectives." 34 C.F.R. § 300.43(a)(2).

124.    The IEP for any transition age child must include  (a) "appropriate measurable postsecondary goals ; (b) based on *age-appropriate transition assessments* related to *training, education, employment*, and, where appropriate, *independent living skills*," and (c) the *"transition services (including courses of study)*" that are required  to assist the child in reaching those goals."

*See* 20 U.S.C. §  1414 (d)(1)(A)(i)(VIII)(aa)-(bb)); *see also* 34 C.F.R. §§ 300.43, 305(e)(3), 300.320(b). *See also* 8 N.Y.C.R.R. §§  200.1(fff), 200.4(b)(6)(viii), 200.4(d)(2)(ix), 200.4(d)(4)(c), 200.4(e)(6).

125.    The IDEA also requires transition services to be "based on the individual child's needs, taking into account the child's strengths, preferences, and interests." Moreover, given the structure of the IDEA, transition assessment provisions must be read in conjunction with the IDEA's reevaluation provisions.

126.    Although Y.A. was of an age where he was supposed to receive transition assessments, transition planning and transition services, the DOE utterly failed to implement any of the transition requirements.

127.    The DOE had not prepared any transition evaluation for Y.A.

128.    The IEPs prepared for Y.A. did not include any transition services (other than the regular program recommendation).

129.    Y.A.'s teacher testified Heartshare provided mainly a traditional academic program with only minimal instruction in practical and functional skills even for students like Y.A., who were not going to graduate.

130.    The DOE's IEP representative who participated in the 2022 IEP testified that he did not know what a "transition assessment" was. When asked if he knew what "transition services" were he responded: "[t]hey are services that work with an adult agency, such as OPWDD, in order to transition from their school-aged years into adult services."

131.    In addition, at the hearing, the district's witness testimony evidenced other policies and practices that violated the IDEA and Section 504, as well as the fact that the DOE has not ensured that their staff charged with implementing the IDEA are properly trained.

132.    For example, the DOE committed multiple procedural violations in preparing the various IEPs which, in part, were committed due to the DOE's failures to adopt appropriate policies and procedures for implementing the IDEA.

133.    The violations were also due to the DOE's failure to train and supervise staff responsible for Y.A.'s IEPs and the IEPs of similarly situated students.

134.    The DOE's IEPs themselves and the testimony about how they were created established that the DOE did not comply with any aspect of the IDEA's mandate to ensure compliance with the IDEA's procedures and to individualize Y.A.'s IEPs.

135.    As noted, and consistent with the parent's testimony, the DOE was unable to meaningfully consider an individualized program.

136.    The 2020 and 2021 IEPs were almost identical in terms of goals, short term objectives and much of the other information.

137.    Although the IDEA requires that children are supposed to be evaluated at least every three years, when M.W. was asked "when was the most recent evaluation" prior to the April 2020 IEP meeting, she responded "I can't answer that one." M.W. testified that she did not know when the last time Y.A. was evaluated at the time of the 2020 IEP meeting. However, she confirmed that the DOE is supposed to assess students every three years.

138.    M.W. also admitted that that under the DOE's policies and procedures in Region 7, when the DOE holds an annual IEP meeting the IEP team will only review "progress reports" and do not, as a matter of policy, review a child's most recent evaluations. She admitted that there were no evaluations reviewed at the 2020 or 2021 IEP meetings.

139.    This policy of the DOE  violates the IDEA which requires that "[i]n developing each child's <u>IEP</u>" the IEP "shall consider" the "most recent evaluation" for the child. 20 U.S.C. §1414(d)(3)(a)(iii).

140.    When M.W. was asked why the supplementary aids and services section of the 2020 IEP was blank (Ex. 11-20), she replied "I can't recall why this page was blank."  T. 540.

141.    M.W. also testified to another policy and practice that violates the IDEA.

142.    Every IEP prepared for every student, including Y.A., must include all "special education, related services, supplementary aides and services, modifications and accommodations" (20 U.S.C. § 1414(d)(1)(A)(i)(IV)) as well as the "frequency, duration and location" of each item. 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

143.    However, as a matter of policy and practice, the DOE does not adhere to this provision of the IDEA when creating IEPs.

144.    Rather, the DOE's IEPs have a section called "Management Needs" which is not required or referenced in the IDEA.

145.    In the Management Needs section of the IEPs created for children entitled to FAPE who are autistic, the DOE lists special education, related services, supplementary aides and services, modifications and accommodation in a list, without designating frequency, duration or location and, as in every IEP, whether, when and to what extent these services and supports are implemented, are all left up to the discretion of the school and staff.

146.    The DOE's IEP witness for 2020 and 2021 in the hearing confirmed that this is how IEPs are written in Region 7.

147.    M.W. could not recall why she indicated on Y.A.'s IEP that he did not require any positive behavior supports and interventions, but listed in the management needs that he needed a

behavior intervention support plan.  M.W. admitted that the only behavior plan that was available for Y.A.  through the IEP was a non-individualized, school-wide positive behavior support to be used during the academic portions of the day.

148.    M.W. also admitted to another policy and practice which violates the IDEA concerning assistive technology.

149.    Every IEP team is supposed to consider assistive technology.   20 U.S.C. § 1414(d)(3)(B)(v).

150.    However, under the DOE's policies and practices, an IEP team cannot consider assistive technology unless the child has been provided with an "assistive technology evaluation."

151.    M.W. indicated that she could not recall whether Y.A. was receiving extended day after school ABA and speech therapy at the time of the 2020 meeting.

152.    M.W. prepared a Prior Written Notice for E.E. concerning the IEP meetings in 2020 and 2021. However, the section of the Prior Notice section where the DOE was supposed to indicate an explanation as to the decisions made at the IEP meeting did not do so; instead, boilerplate language was used.

153.     It is a practice of the DOE to issue boilerplate prior notices after an IEP meeting, rather than to individualize the notice to provide parents notice of the IEP team's rationale for the decisions made at the meeting as the IDEA requires.

154.    Further, the goals on the 2020 and 2021 IEPs were vague and not measurable. At the hearing, despite allegedly having written the IEP goals, M.W. was unable to explain most of the goals.

155.    The 2020 and 2021 IEPs were prepared when Y.A. was still receiving remote instruction due to the Pandemic, (Ex. 7-1), but neither IEP provides any goals or services for implementing remote instruction.

156.    Moreover, according to the DOE IEPs placed in evidence at the hearing, Y.A. regressed between the 2020 IEP and the 2021 IEP. The 2020 IEP indicates that Y.A. "can read at a fifth-grade level but needs help answering questions; he can usually answer with 80% accuracy. He does well in math, he can multiply and divide. He is good at math word problems." However, the 2021 IEP indicates "Y.A.'s academic performance is below grade level in reading and math. He has trouble comprehending above a fourth-grade level of reading." The IEP also notes that E.E. reported that Y.A. regressed in terms of his socialization skills during the Pandemic.

157.    The DOE presented a different witness who served as the District Representative at the March 18, 2022 IEP meeting.

158.    J.S. explained that the DOE continuum was the spectrum of services available in New York City. He admitted that there were limited options in the City for services and ratios. T

159.    J.S. admitted that there were no evidence-based strategies on the DOE continuum.

160.    J.S. was unable to explain basic aspects of the 2022 IEP, such as supplementary aids, services, supports, accommodations and modifications.

161.    Further, J.S. also wrote on the 2022 IEP that Y.A. does not require "positive behavioral supports" to address behavior. He explained that Heartshare "never felt it was appropriate to create something, a behavioral management strategy just for" Y.A. because the school had a school-wide behavior plan. However, J.S. was unable to describe that plan.

162.    As in the case of the 2020 and 2021 IEPs, the DOE did not consider any assistive technology at the 2022 IEP meeting because the DOE had not conducted an assistive technology evaluation.

163.    J.S. reiterated the policy and practice explained by M.W. relative to the Management Needs section of the DOE's IEPs.  When asked at the hearing why there was no frequency, duration or location listed for any of the items in the "Management Needs" section of the 2020 IEP, J.S. explained that those items were left up to the teachers to implement in their full discretion, as they deem appropriate.

164.    J.S. did not seem to understand the Management Needs that he included in the IEP, as he claimed, "discrete trial training" was "a methodology of monitoring how the child is behaving."

165.    Additionally, J.S. determined that Y.A. was eligible for the New York State Alternate Assessment on the 2020 IEP.  However, J.S. admitted that Y.A. should have had an evaluation before making that determination and that children with IEPs have to be assessed every three years.

166.    Like M.W., J.S. was not sure when Y.A.  was last evaluated.

167.    J.S. also explained that he assumed that every child in Heartshare was designated as eligible for alternative assessment because *the school does not have the capacity to issue regular diplomas*.   However, the IDEA prohibits the DOE from placing a child who is eligible for the alternative assessment in a program that does not afford them any opportunity to pursue a regular diploma. 34 C.F.R. 300.160(d) (DOE may "[n]ot preclude a student with the most significant cognitive disabilities who takes an alternate assessment  . . . from attempting to complete the requirements for a regular high school diploma.")

168.    It is unclear how or why Y.A. and the other children were placed in a school that lacks the capacity to issue a regular diploma and also failed to offer a vocational-based curriculum.

169.    The 2022 IEP noted that Y.A. was "below grade level" in academic areas, as well as "social interaction group instructions, follow classroom machines and  generalized responding." J.S. admitted that when he had the meeting, he did not have any information about the extent to which Y.A. was "below grade level" in these areas, as he was not provided the specifics.

170.    The DOE did not try to establish the appropriateness of the class or instruction for the 2020-2021 and 2021-2022 SYs, but the DOE's lawyer did call Y.A.'s "teacher for the 2023-2024 school year, "S.W."  However, it was established at the hearing that S.W. lacked a teacher's certification and was only a teaching assistant when she taught as the lead teacher in Y.A.'s class. Further, S.W. had no training or certification in ABA, and she had no behavior plan for Y.A.

171.    S.W.'s testimony underscored that the Heartshare program was not appropriately tailored to Y.A.'s needs or focused on his individual transition goals and skills needed to be independent.

172.     S.W. testified that the schedule of Y.A.'s program for the 2023-2024 school year started at 8:30 and included toileting, breakfast, ELA, math, social studies, science, gym, lunch, art, independent work, computer, and dismissal at 2:30.  Computer was a choice between an iPad and game, which was not an instructional period.

173.    At some point, S.W. claimed that every class included "vocational" instruction, but this conflicted with her description of the day which was focused almost exclusively on academic subjects. E.E. had subpoenaed documents from Heartshare about the curriculum, but the school did not fully comply with the hearing officer's subpoena.

174.    Initially M.W. testified that the claimed that "independent work" period was "worksheets" (T. 378), but it was allegedly mixed with "vocational." She claimed she worked with the students on how to order at a restaurant or fill out a job application, but she had no knowledge of whether he had already been taught those skills or was working on them (*Id.*), as he was through Kidz Choice. She also claimed that she worked with the whole class on sorting laundry, washing dishes, finding items in a market, reading a light bills and writing a check. She said Y.A. already knew how to fold laundry and make a grocery list and did not learn those skills in her class. . The skills she taught were not meaningfully aligned with any of his specific transition goals and were without regard to whether he already had those skills, as they were merely being taught to the entire class.

175.    The only community trip that Y.A.'s class took during this critical transition year was to S recycle at Key Food on Wednesdays.

176.    S.W. explained that the last year Y.A. was in school, the class was learning "Algebra."  When S.W. was asked about why Y.A. was learning Algebra, and whether she expected Y.A. to go to college,  she said it was up to the family.  However, she did confirm that the credential Y.A. obtained from Heartshare was not a diploma that could be used for college.

177.    S.W. testified that she thought Y.A. might be able to take the GED, although she admitted she had not been preparing him for taking the GED test. She also admitted that  she had no knowledge of grade levels required in reading, math and writing to pass the GED.

178.    E.E. had argued at the hearing that, the IEPs prepared for Y.A. were procedurally and substantively invalid.

179.    E.E. alleged that the DOE denied Y.A. a FAPE, because, *inter alia,*  Y.A. did not receive adequate access to instruction during the Pandemic, that the IEPs and program did not

adequately address transition skills and vocational skills, and because the IEPs – as a matter of policy and regardless of Y.A.'s individual needs – did not consider or offer to continue Y.A.'s long-standing extended day program of 1:1 instruction, ABA and speech therapy. The DOE did not meaningfully address any of the above claims.

180.    Further, E.E. established – even though she did not have that burden – that the extended day program was central to any skills that she observed Y.A. acquiring over the years, without which Y.A. was not speaking, communicating, able to participate in the community or engage in any appropriate leisure or community-based skills.

181.    At the hearing, E.E. and the director of one of the agencies that provides Y.A. with his extended day services testified and articulated the reasons why the Y.A. required Autism Services and additional services focused on vocational skill development, social skills, community skills and activities of daily living.

182.    The evidence showed that while Y.A. made progress with his extended-day Autism Services, the in-school portion of his program was not individualized, appropriate, or designed to produce effective outcomes for Y.A. given that he was not going to be earning a regular high school diploma.  Further, the DOE did not provide (and lacked the capacity to provide) vocational training and transition services during the four corners of the school day during the entire time that Y.A. had been of the age where such services were required.

183.    Further, this record shows that year after year the DOE engaged in a wholly pretextual IEP process whereby the DOE and their staff made zero effort to effectively reevaluate Y.A. and create an individualized program for him.

184.    The DOE essentially violated almost every provision of the IDEA during the years at issue.

185.    It is shocking that the DOE would treat the IEP process for E.E. and Y.A. in this fashion, given that they are represented by counsel and are named plaintiffs in a class action lawsuit.

186.    It is not hard to imagine the experiences of parents who lack access to lawyers and federal court.

### The IHO In Case No. 205876 Rules for E.E.

187.    On April 18, 2024, the IHO in Case No. 205876 issued a decision finding that the DOE denied Y.A. a FAPE for all the SYs at Issue II (the "2024 Decision").

188.    The IHO ordered compensatory education for the deprivation of FAPE, as well as compensatory education to make up for the difference between Y.A.'s pendency mandate and the services that he received.

189.    Specifically, the IHO ordered the following:

> Within 30 days of the date of this order, the District will calculate the amounts of each pendency service (except for the classroom portion of the District placement), provided since January 8, 2021; to the extent that services were lacking, the District shall create a bank of hours for such services, and make them available to the Parent for use until such bank is exhausted (with an expiration date of 3 years from the date of this order). To the extent that the District cannot supply the services, the Parent may arrange for such services and bill the District directly or seek reimbursement for payments at the prevailing market rate at the time the services are rendered.

> As with the pendency services noted above, based upon the record and testimony in this case, I order that the District audit this Student's account within the next 30 days, and to the extent that the After-School services for Speech and ABA were not provided or paid for during the June 1, 2020 thru January 7 2021 time period then payment should be made forthwith, or banks of such services shall be set up and maintained by the District until such time that the services have been provided (with an expiration date of 3 years from the date of this order). To the extent that the District cannot supply the services, the Parent may arrange for such services and bill the District directly or seek reimbursement for payments at the prevailing market rate at the time the services are rendered.

190.    In addition to the above relief, the IHO ordered the following:

The District shall create a bank of 630 hours of 1:1 instruction using natural environment ABA strategies equal to 3 hours per day (15 hours per week for 42 weeks), that can be used for vocational training, travel training, transition services, and rehabilitation. (with an expiration date of 3 years from the date of this order). To the extent that the District cannot supply the services, the Parent may arrange for such services and bill the District directly or seek reimbursement for payments at the prevailing market rate at the time the services are rendered.

191.    The DOE has not complied with the 2024 Decision in that it has not calculated the compensatory banks for purposes of pendency or if it has, it has not advised E.E. about the number of compensatory hours were being awarded.

192.    This is particularly important as the parties have a dispute as to whether Y.A. continued to be eligible for stay-put services until his twenty-second birthday.

**Defendants Owed Y.A. a FAPE Until He Turned Twenty-Two**

193.    Defendants failed to offer Y.A. a FAPE up until the date he turned twenty-two. The IDEA mandates that a "free and appropriate public education" shall be "available to all children with disabilities . . . between the ages of 3 and 21, inclusive . . . ." 20 U.S.C. § 1412(a).

194.    Eligibility under the IDEA for special education and related services ends, therefore, when a student reaches that age of 22. *St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 168-69 (2d Cir. 2001) ("If the word 'inclusive' is to mean something, as it must, it means that the relevant period begins on a child's third birthday and ends on the last day of his 21st year (which culminates in his 22nd birthday.")

195.    States may limit age eligibility for special education students, however, *only* to the extent it is limited for public education generally.

196.    The IDEA provides that:

The obligation to make a [FAPE] available to all children with disabilities does not apply with respect to children—(i) aged 3 through 5 and 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or

the order of any court, respecting the provision of public education to children in those age ranges . . .

20 U.S.C. § 1412(a)(1)(B).

197.    According to the IDEA's legislative history, this exception was intended to ensure equality of treatment between disabled and non-disabled students and does not apply "where a state does now in fact provide or assure the provision of free public education to non-handicapped children in these age groups." S. Rep. No. 94-168, 1975 U.S.C.C.A.N. 1425, 1442-42 (1975).

198.    To determine whether a state may terminate special education services before the age of 22, a court must look to that state's "law" or "practice" concerning public education in general (*i.e.*, not law or practice specific to special education) for individuals in that same age range.

199.    New York law also directs the districts and other entities under the NYSED's supervision and control to provide programs of public education, including elementary and secondary education, to adults. N.Y. Educ. Law § 4604.

200.    New York Law provides that districts deliver adult education, including education to prepare individuals between the age of twenty-one and twenty-two for a high school equivalency degree, as well as vocational education.

201.    In *A.R. v. Connecticut State Board of Education*, 5 F.4th 155 (2d Cir. 2021), the Second Circuit held that Connecticut was required to provide a FAPE to all children up to the age of twenty-two. In doing so, the Court held that public education includes services provided (a) "at public expense with significant state or local governmental funding"; (2) "under the administration, supervision or oversight of a state educational agencies"; and (3) "with the objective of educating students up to the level of academic proficiency associated with the completion of secondary school." *A.R.*, 5 F.4th at 157.

29

202.    In issuing the *A.R.* opinion, the Second Circuit joined the Ninth Circuit, which issued a similar ruling in *E.R.K. v. State of Hawaii Dep't of Educ.*, 728 F.3d 982 (9th Cir. 2013), finding that a FAPE had to be provided to students in Hawaii up to the age of twenty-two due to the provision of adult education to students between ages twenty-one and twenty-two and the First Circuit in *K.L. v. Rhode Island Board of Education*, 907 F.3d 639 (1st Cir. 2018), which issued a similar determination about the right to FAPE in Rhode Island.

203.    After the Second Circuit's opinion in *A.R.*, on July 6, 2023, the general counsel's office for the New York State Education Department ("NYSED") issued a Formal Opinion Of Counsel relating to the applicability of the opinion in *A.R.* in New York ("NYSED Opinion").

204.    The NYSED Opinion concluded that districts were required to provide a FAPE up to a student's twenty-second birthday, notwithstanding contrary state law and/or regulations.

205.    Moreover, the NYSED Opinion advised that education should extend beyond that date, depending on the student's birthday:

> The fact that students' 22nd birthdays may fall at any point during a school year, however, is a complication not addressed by the A.R. decision. While not required by the decision, SED's Office of Special Education recommends that school districts consider providing such services through the end of the school year in which the student turns 22 or upon receipt of a high school diploma, whichever occurs first.[2]

206.    New York State and New York City law and regulations limit the provision of FAPE until the conclusion of the school year in which that resident turns 21, or upon receipt of a Regents or local high school diploma, except that students who turn twenty-one during the summer months can receive services during the six-week extended school year program provided for under New York Law.

207.    During the hearing, Y.A. turned twenty-one.

---

[2] *Id*. at fn 1.

208.   Under the Defendants' policies, Y.A. was only entitled to a FAPE until June 2023.

209.   However, as he was entitled to a FAPE up to age twenty-two, he was entitled to pendency during the 2023-2024 school year until he turned twenty-two.

210.   In June of 2023, Plaintiffs requested that Defendants continue to implement Y.A.'s stay-put as E.E. was asserting that Y.A. was eligible to receive a FAPE up to the age of twenty-two.

211.   Defendants agreed to continue funding Y.A.'s extended-day program but did not offer any program for the school-day portion of the year as Heartshare was no longer available.

212.   Due to the fact that the question of whether all children are entitled to FAPE up to the age of twenty-two is being litigated in a separate federal action in the Southern District of which Y.A. is a putative class member, E.E. has not yet filed a new hearing concerning the 2023-2024 school year.

**Defendants Adopted, Implemented and Maintained Policies, Practices and Procedures in Violation of the IDEA and Section 504**

213.   Defendants do not appropriately evaluate and assess students with Autism like Y.A. to determine whether they require Autism Services.

214.   Defendants offer a "few-sizes-fits-most" approach to special education for children with Autism.

215.   Defendants refused to recommend the services that Y.A. required for a FAPE, namely, ABA, 1:1 instruction, and home-based services.

216.   Defendants have not ensured that their menu of service options for children with autism includes 1:1 instruction, ABA and home-based or extended-day services that were ordered for Y.A.

217.   As a result, Defendants have consistently predetermined Y.A.'s IEPs and

31

terminated funding for his services, which, as a result, causes Plaintiffs to engage in a constant state of litigation to maintain her program.

218.   The only way for the Plaintiffs to maintain Y.A.'s FAPE was to engage in litigation during every second that Y.A. was receiving special education services.

219.   Further, even when E.E. engaged in litigation and won relief, that relief was not provided to Y.A. (or not provided in a timely manner).

220.   Defendants do not appropriately evaluate and assess students with Autism  for purposes of transition.

221.   Defendants do not have the capacity to conduct vocational assessments for children with IEPs.

222.   Defendants are required to consider assistive technology at every IEP meeting under the IDEA. However, under the Defendants' policies and practices, Defendants' IEP teams cannot consider assistive technology unless the DOE conducts (or the parent provides) an assistive technology evaluation. Only a small number of children with IEPs are afforded assistive technology evaluations, and therefore the Defendants are out of compliance with this provision of the IDEA.

223.   State-approved non-public schools like Heartshare and the DOE cannot offer students after-school and extracurricular activities under an IEP. Further, even if schools and non-public programs wanted to offer children with IEPs access to after-school programs, the Defendants do not offer special education transportation to children with IEPs.  However, Defendants do offer children who do not need busing three Metrocards so that they can participate in after-school activities operated at public and charter schools.

224.   The Defendants' policies, procedures and practices violate 34 C.F.R. § 300.107 and

34 C.F.R. § 300.117, in that Defendants' IEP teams cannot consider after-school or extended day IDEA services.

225.    Y.A. was subjected to these policies and practices for several years, which violate the IDEA and Section 504.

226.    There was no remedy to address the claims in this action.

227.    Further, E.E. attempted to exhaust administrative remedies, but hearing officers did not have jurisdiction over systemic claims, policy claims or claims about lack of implementation of other hearing officer's orders.

228.    Further, the Defendants failed to ensure that there are schools in New York City to meet the needs of children like Y.A. who are older and needed both ABA, 1:1 instruction for all or part of the day, and vocational and ADL skills.

229.    Even when was an order for the DOE to provide the services that were the subject of the litigation, the Defendants order for the DOE to provide ABA, home-based services, transportation paraprofessionals and special equipment, the DOE routinely foists the responsibility for implementing the order onto parents.

230.    There were not enough professionals who have appropriate credentials and training to ensure provision of ABA services to all students who are entitled to receive ABA through hearings as relief.

## CLAIMS

## CLAIM I
## THE IDEA

231.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

232.    Defendants did not offer Y.A. a FAPE for the school years alleged herein.

233.    Plaintiffs have exhausted the administrative procedures for each of the school years alleged herein to the extent required by the IDEA.

234.    For the school years at issue which have already resulted in final, unappealed decisions, IHOs have found that the Defendants failed to provide Y.A. with a FAPE.

235.    Defendants have failed to timely and fully implement the decisions issued on behalf of E.E.

236.    Defendants failed to timely and fully implement Y.A.'s stay-put placements through the school years at issue.

237.    Defendants' adoption of the policies, procedures, and practices a described herein violate the IDEA.

238.    Defendants' failure to implement appropriate policies, procedures, and practices to ensure that Y.A. was appropriately evaluated, that his IEPs were substantively and procedurally adequate and not predetermined, and that the placements were appropriate violated the IDEA.

239.    Defendants repeated and ongoing application of blanket policies and practices to Y.A.'s IEP and placement violates the IDEA.

240.    Defendants denied Plaintiffs their due process rights under the IDEA by failing to issue appropriate prior notices memorializing the decisions made by the DOE including the decisions made at the pretextual IEP meetings in writing.

241.    Plaintiffs should be awarded compensatory education and other equitable relief based on Defendants' failure to implement pendency.

242.    As the prevailing party in IH Case Nos. 175916 and 184047, Plaintiff E.E. is entitled to payment of reasonable legal fees for work performed in connection with the impartial

hearings.

243.     The fees and costs charged by Plaintiff's counsel at the hearings and for this action are reasonable and are consistent with market rates for the legal services performed, in light of counsels' experience and expertise and the complexity of the issues.

## CLAIM II
## 42 U.S.C. § 1983

244.     Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

245.     Defendants have violated 42 U.S.C. § 1983 by depriving Plaintiffs, under color of state law, of their rights, privileges, and immunities under federal statutory and constitutional law.

246.     By implementing, promulgating, and continuing to enforce and/or effectuate policies, practices, and customs as alleged herein, Defendants have denied Y.A. the educational services to which he is entitled under the IDEA and New York law, in violation of 42 U.S.C. § 1983.

247.     By failing to implement the decisions of the hearing officers issued on behalf of E.E. and Y.A., as well as Y.A.'s pendency, Defendants violated 42 U.S.C. § 1983.

248.     By implementing, promulgating, and continuing to enforce and/or effectuate policies, practices, and customs as alleged herein, Defendants violated Plaintiffs' rights under the IDEA and New York State law, in violation of 42 U.S.C. § 1983.

249.     By failing to supervise and train their employees and agents responsible for Y.A.'s special education evaluations, IEPs and placements concerning the federal and state laws and policies concerning the IDEA, IEPs, pendency, and implementation of pendency and final IHO decisions, Defendants have violated 42 U.S.C. § 1983.

250.     The Defendants violated Plaintiffs' rights under 42 U.S.C. § 1983 by failing to have

adequate policies, procedures, protocols, and training to ensure that the provisions of the IDEA referenced herein were complied with, which deprived Y.A. of his right to a FAPE under federal and state law.

251.    Under color of state law, the Defendants deprived Y.A. of his right to special education services afforded to him under New York State law, in violation of the Fourteenth Amendment of the U.S. Constitution.

252.    As a direct and proximate result of the Defendants' misconduct, Plaintiffs have suffered and will continue to suffer harm.

**CLAIM III**
**SECTION 504**

253.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

254.    Defendants' conduct is knowing, intentional, reckless, and gross.

255.    Y.A. is a qualified individual with disabilities entitled to protection under Section 504.

256.    Defendants discriminated against Y.A. under Section 504 by, *inter alia*, denying him reasonable accommodations, adopting systemic policies, procedures and practices that violate their rights under the IDEA.

257.    Defendants discriminated against Y.A. under Section 504 by, *inter alia*, engaging in widespread and pervasive violations of the IDEA and denying Y.A. a FAPE and failing to timely implement Y.A.'s pendency for several years.

258.    Defendants' conduct described throughout was  intentional, extensive, repeated, gross, reckless, grossly reckless and the Defendants acted with reckless disregard for the rights of E.E. and Y.A.

36

259.    Defendants discriminated against Y.A. because of his autism by, *inter alia*, denying children with IEPs access to educational services and after-school services that were provided to typically developing students and resulted in Y.A. being excluded from any access to programs afforded to typical peers.

## CLAIM IV
## THE ADA

260.    Plaintiffs repeat and re-allege the allegations of all the above paragraphs as if fully set forth herein.

261.    The ADA, like Section 504, prohibits discrimination based on disability.

262.    Y.A. is a qualified individual with a disability entitled to protection under the ADA.

263.    Defendants discriminated against Y.A. because of his autism by, *inter alia*, denying him reasonable accommodations, adopting systemic policies, procedures and practices that denied him access to educational services and after-school services that were provided to typically developing students.

264.    Defendants discriminated against Y.A. by, *inter alia*, committing extensive, repeated, gross, knowing and reckless violations of multiple provisions of the IDEA and New York State law.

265.    Defendants' actions (and inactions) discriminated against Y.A. on the basis of his autism when it failed to make individualized determinations of his needs and recommendations.

266.    As a result of Defendants' actions, Y.A. has suffered, and will continue to suffer, harm.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court:

i.    Assume jurisdiction over this action;

ii.    Issue a declaratory judgment on behalf of the Plaintiffs that the actions, inaction, policies, procedures, and practices as alleged herein violate the applicable federal laws as asserted herein;

iii.    Award Plaintiffs compensatory education and other appropriate equitable relief for the violations alleged herein;

iv.    Award Plaintiffs reasonable attorney's fees and costs for IH Case Nos. 175916, 184047,  and 205876 with prejudgment interest thereupon;

v.    Award Plaintiffs attorneys' fees and costs incurred with respect to this action; and

vi.    Award such other and further relief as the Court may deem just and proper.


Dated:        December 24, 2024
              New York, New York



Respectfully submitted,

THE LAW OFFICE OF ELISA HYMAN, P.C.

*/s/ Elisa Hyman*

By: _____
     Elisa Hyman
     The Law Office of Elisa Hyman, P.C.
     1115 Broadway, 12th Floor
     New York, NY 10010
     Phone: (646) 572-9064
     Elisahyman@gmail.com